**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 15-20006-JAR** |
| **PETSAMAI PHOMMASENG,** | |
| **a.k.a. Petsami Phommaseng** | |
| **a.k.a. Phetsamai Phommaseng** | |
| **a.k.a. "Pet," and** | |
| **SUSAN KHAMPANNHA,** | |
| **Defendants.** | |

### MEMORANDUM AND ORDER

Before the Court are the following motions by Defendant Petsamai Phommaseng: (1) Motion to Suppress Evidence Obtained From the Search of his Home (Doc. 37); (2) Motion to Suppress Fruits of First Traffic Stop (Doc. 39); (3) Motion to Suppress Fruits of Second Car Stop (Doc. 41); (4) Motion to Dismiss Counts 2 and 3 (Doc. 43); and (4) Motion to Suppress Statements to Police (Doc. 45). The Court held an evidentiary hearing and argument on these motions on August 21, 2015. Also before the Court is Defendant Susan Khampannha's Motion to Sever (Doc. 36). The Court heard argument on this motion on August 20, 2015. Having considered the briefs, the evidence adduced at the hearings, and the arguments of the parties, the Court is prepared to rule on all pending motions. As described more fully below, the Court denies Defendants' pretrial motions. The Court discusses Defendant Phommaseng's evidentiary motions first, in chronological order, then his motion to dismiss, and then Defendant Khampannha's motion to sever.

1

I.     **January 1, 2015 Traffic Stop**

    A.  **Factual Background**

The Court finds the following facts by a preponderance of the evidence.  On January 21, 2015, Lawrence, Kansas Police Officer Kenneth Rodgers was on a patrol shift from 7:00 a.m. to 5:00 p.m., when he observed Defendant Petsamai Phommesang driving a Cadillac at the intersection of 21st Street and Ousdahl Road.  Officer Rodgers was familiar with Phommesang.  He had arrested him on warrants approximately two to three years before that date.  During that incident, Defendant became immediately excited and argumentative.  Officer Rodgers remembered Defendant had firearm parts in his vehicle at the time of his arrest.  Officer Rodgers was also aware that a search warrant had been executed at Defendant's home the prior month during the course of an investigation into methamphetamine and marijuana distribution; officers found firearm parts and ammunition.  Officer Rodgers was also aware from a police bulletin that Defendant had made aggressive comments about harming a police officer.  Officer Rodgers knew that Defendant's residence was just a few blocks away from the intersection of 21st and Ousdahl and decided to follow the Cadillac.  Defendant took an indirect route to his residence on Ousdahl Road, where he turned into the driveway without using his turn signal.

Officer Rodgers initiated a traffic stop in Defendant's driveway.  When he stepped out of his patrol car, he noticed a turquoise truck was also parked in the driveway and one occupant was inside.  Officer Rodgers ordered that person to stay in the vehicle, and also repeatedly ordered Defendant and the passenger in the Cadillac to stay in the car.  Defendant began arguing with Officer Rodgers and did not comply with his command to stay in the car.  Likewise, the passenger, who was later identified as Leo Johnston, got out of the vehicle.  Johnston was holding a butane torch.  Officer Rodgers feared the butane torch could be used as a weapon; he was also aware from his training and experience that

butane torches are often used by methamphetamine users.  Despite Officer Rodgers ordering Defendant to keep his hands out of his pockets, Defendant kept moving his hands toward his pockets. He removed a set of keys and some change and placed it on the car.  Because Defendant did not comply with Officer Rodgers' orders, he decided to handcuff him in order to isolate him until another officer could arrive.  He told Defendant that he was waiting for backup and that they were not going to jail.  Indeed, when he called dispatch for backup, he added "step it up."

Johnston walked away, contrary to Officer Rodgers' orders to stop.  Defendant told him to "tell her to call my lawyer," as Johnston open the door to the residence, and appeared to be talking to a female who was inside.  Then, Johnston removed the items on Defendant's vehicle and tried to hand them to the female, who was later identified as co-defendant Susan Khampannha.

Lawrence Police Officers Steven Osborn and Burke then arrived as back-up.  Officer Rodgers patted down Defendant and Officer Burke patted down Johnston.  When Officer Rodgers patted down Defendant, he thought he felt a Swiss Army knife, but when he emptied Defendant's pocket, he discovered a clear rectangular container of pills—it was not a prescription container.  Defendant told Officer Rodgers that he was dropping them off for somebody.

Officer Rodgers next used Defendant's key to open the driver's side door to the Cadillac. Officer Rodgers decided to "pat down" the vehicle for weapons because he was still surrounded by three to four people, he did not know if anyone else had keys to the vehicle, and he knew he would be calling for a canine unit.  Officer Rodgers only looked for weapons that would be within the immediate reach of Defendant, or one of the other individuals.  He examined a flashlight that was laying in the front seat.  He discovered the vehicle registration, which showed that the Cadillac was registered to someone named Cody Cavenaugh.  Officer Rodgers did not find any firearms, drugs, or other contraband after this pat down search.

At this point, which was about eleven minutes into the traffic stop, Defendant was sitting inside Officer Osborne's vehicle because it was cold outside.  The turquoise truck pulled out of the driveway and left; it never returned.  Khampannha also left in her vehicle with two children.  While he waited on the canine unit to arrive, Officer Rodgers examined the pills he had found in Defendant's pocket.  They were labeled "TEVA," which Officer Rodgers knew was a prescription drug manufacturer.  But he did not know if they were a controlled substance, so he checked drugs.com on his computer in the patrol car, which told him the pills were Diazepam.  He called another officer at the station who had the "drug bible," to try to determine if they were a controlled substance.  Officer Halstead informed him that this was a Schedule 4 prescription only medication.

Khampannha returned to the home in her grey vehicle about one minute before the Kansas Highway Patrol ("KHP") arrived with the canine unit.  Officer Rodgers asked her to stay in the house or stand aside during the canine sniff.  The KHP trooper told Officer Rodgers that the dog alerted around the driver's side door handle.  The trooper told Officer Rodgers that he believed the dog alerted to the odor of drugs or the residual odor of drugs inside the vehicle.  Believing he had probable cause to search, Officer Rodgers then opened the driver's side door to the vehicle, noticing that the whole door panel was loose and hanging.

Upon searching the vehicle, Officer Rodgers found a firearm in a natural void near the dashboard and behind the radio.  He also found 3.5 grams of methamphetamine, a distribution quantity, on the passenger side floor, underneath the seat and covered by some clothing.  Officer Rodgers also found several cell phones.  Given the amount of methamphetamine found in the vehicle, and the fact that Defendant possessed several firearms, Officer Rodgers believed the cell phones were used in furtherance of illegal activity.

### B.  Discussion

Defendant moves to suppress the evidence derived from this traffic stop on the following grounds: (1) Officer Rodgers lacked a reasonable belief that the item in Defendant's pocket was a weapon, and it was not immediately apparent that it was contraband; (2) Officer Rodgers effectively seized Defendant's vehicle without probable cause when he took his keys, unlocked the door, and searched while he was handcuffed; (3) the detention turned into an illegal arrest during the time spent waiting on the drug detection dog to arrive; (4) the canine search was illegal because it was obtained by trespassing on Defendant's property, in contravention of *Florida v. Jardines*[1]; and (5) the Court should suppress any evidence obtained from the seized cell phones because they were seized without probable cause.

### 1.  The Patdown Searches

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[2]  The Tenth Circuit has defined three types of police-citizen encounters:

> (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.[3]

The parties agree that this case involves the second type of encounter, an investigatory detention. During a lawful investigatory detention, "[t]o justify a patdown of the driver or a passenger . . . , just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable

---

[1] 133 S. Ct. 1409 (2013).

[2] U.S. Const. amend. IV.

[3] *United States v. Brown*, 496 F.3d 1070, 1074 (10th Cir. 2007) (quoting *United States v. Davis*, 94 F.3d 1365, 1467–68 (10th Cir. 1996)).

suspicion that the person subjected to the frisk is armed and dangerous."[4]  Defendant does not challenge the legality of the initial investigatory detention in this case based on the failure to use his turn signal, but argues that Officer Rodgers lacked a reasonable suspicion that Defendant was armed and dangerous to justify continuing with a patdown search.

In determining whether an officer had reasonable suspicion that Defendant was armed and dangerous, the Court considers the totality of the circumstances and views "the officer's conduct through a filter of common sense and ordinary human experience."[5]  "[I]n determining whether the officer acted reasonably . . . due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."[6]

The Court finds that under the totality of the circumstances, Officer Rodgers had a reasonable suspicion that Defendant was armed and dangerous, sufficient to justify a patdown search of his person and his vehicle.  First, Officer Rodgers was very familiar with Defendant even before he initiated the traffic stop on January 21.  He was aware of an ongoing investigation regarding drug distribution and firearms, and he knew that Defendant had previously resisted an arrest and had threatened a police officer.  Defendant was known to have possessed firearms and firearm parts as part of those past arrests and investigations.  An individual's involvement with drug distribution can support a reasonable suspicion to frisk for weapons.[7]  And "[a]n officer's knowledge of past criminal conduct is probative of whether the defendant is armed and dangerous, especially if a weapon was involved."[8]  And certainly Defendant's reputation as combative with police officers in general, and specifically

---

[4]*Arizona v. Johnson*, 555 U.S. 323, 327 (2009).

[5]*United States v. Garcia*, 459 F.3d 1059, 1064 (10th Cir. 2006).

[6]*Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

[7]*Id.* at 1064–65.

[8]*United States v. Garcia*, 751 F.3d 1139, 1145 (10th Cir. 2014).

with Officer Rodgers on January 21, led to his reasonable suspicion.

Moreover, Officer Rodgers reasonably suspected Defendant may be armed and dangerous on this date because: (1) he repeatedly reached into his pockets despite commands telling him to stop; (2) he got out of the vehicle despite commands telling him to stay in the vehicle; (3) Johnston ignored commands to stay in the vehicle and was walking around with a butane torch that could be used as a weapon, and (4) another unidentified individual was sitting in the turquoise truck.

The Court also credits Officer Rodgers' testimony that he believed he felt a knife in Defendant's pocket during the initial patdown.  Given this belief, he was justified in emptying Defendant's pockets, at which point he discovered the pills. "If, while conducting a legitimate *Terry* search of the interior of the automobile, the officer should, as here, discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances."[9]  If the item's "incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may size it without a warrant."[10] The Court finds that the pills' incriminating character was immediately apparent to Officer Rodgers and he was justified to seize them without a warrant.  The pills were in a translucent package marked "TEVA," and not in a prescription bottle or accompanied by a prescription, he knew that TEVA manufactured prescription drugs, and he knew that Defendant was a suspected drug trafficker. Under the circumstances of this case, Officer Rodgers was justified in seizing the pills, despite the fact that he did not know exactly what type of drug they were at the time he seized them.  He knew they were a prescription drug that was not in a prescription container, or accompanied by a prescription, held by a suspected drug trafficker.

The Supreme Court has explained that "'[i]f the protective search goes beyond what is

---

[9]*Minnesota v. Dickerson*, 508 U.S. 366, 374 (1993) (quoting *Michigan v. Long*, 463 U.S. 1032, 1050 (1983)).
[10]*Id.* at 375.

necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed.'"[11]  The Court finds that it was reasonable for Officer Rodgers to visually inspect the Cadillac for weapons after he patted down Defendant.  He did not know whether Johnston or the person in the truck had keys to the Cadillac, and given Defendant's and Johnston's histories and combativeness during the stop, it was reasonable for Officer Rodgers to ensure that none of the individuals involved in the stop could access a weapon.  Officer Rodgers did not conduct a full search of the vehicle, but merely checked to make sure there were no weapons within reach of the individuals involved in the traffic stop.  The Court further notes that the officer did not find any incriminating evidence during this initial patdown of the vehicle so even if the vehicle patdown search was illegal, it did not lead to any evidence that would require suppression.

### 2.   Delay Attributable to Drug Dog

Next, Defendant complains that waiting on the KHP canine unit to arrive illegally prolonged his detention.  He argues that Officer Rodgers never performed the tasks that are typically performed during a traffic stop, such as asking for Defendant's license and registration, so therefore he lacked a legal justification for detaining him for twenty-five minutes while he waited on the KHP to arrive.

As Defendant correctly notes, a routine traffic stop is usually a relatively brief encounter, and the duration of that detention is "determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns."[12]  The mission typically involves checking driver's licenses, running a background check on the driver, and inspecting the vehicle's registration and proof of insurance.[13]  "[A] dog sniff is not fairly characterized as part of the officer's

---

[11]*Id.* at 373 (quoting *Sibron v. New York*, 392 U.S. 40, 65–66 (1968)).

[12]*Rodriguez v. United States*, 135 S. Ct. 1609, 1614–15 (2015).

[13]*Id.*

traffic mission."[14]   Nonetheless, an officer may prolong an otherwise completed stop if he has reasonable suspicion of criminal activity.[15]

First, it is not apparent from the evidence that the detention was prolonged by twenty-five minutes waiting on the KHP to arrive for the canine sniff.  Defendant and Johnston immediately engaged Officer Rodgers in a course of conduct that forced him to secure the scene in the interest of officer safety before he could begin to effectuate the purpose of the stop.  It is unclear from the evidence at exactly what point Officer Rodgers called the canine unit, but by the 10:05 mark on the videotape of the traffic stop,[16] Officer Rogers had secured Defendant and was discussing the pills with Officer Halstead at the police station, when he can be heard referring to the "drug dog coming."  By the 20:55 mark of the video, the KHP had arrived.  About seven minutes later, the dog had alerted at the driver's side of the vehicle.  The entire stop lasted approximately thirty-five minutes.

Moreover, the dog sniff in this case did not unlawfully prolong the detention because Officer Rodgers had developed reasonable suspicion that criminal activity was afoot.  He was aware of Defendant's criminal history, which included an ongoing investigation of drug distribution and firearms possession; Defendant had taken an indirect route to his residence before the stop, suggesting he was trying to elude the officer; Defendant and Johnston engaged in erratic and combative activity relative to the traffic violation for which they were stopped, including refusing commands to stay in the car, and passing items from the car to Khampannha inside the residence; an unknown individual was sitting in a pickup truck next to the patrol car in the driveway; the vehicle was not registered to Defendant; and Officer Rodgers found an unmarked container of prescription medication when he patted down Defendant, which Defendant stated he was dropping off for someone.  Because Officer

---

[14]*Id.*

[15]*Id.* at 1614, 1616.

[16]Gov't Ex. 1.

Rodgers developed reasonable suspicion of separate criminal activity after initiating the traffic stop, the short delay while waiting for the canine unit to arrive did not unreasonably prolong the detention.

### 3. Trespassing Under *Florida v. Jardines*

Next, Defendant argues that since the officers employed the drug-sniffing canine outside of his residence, a heightened Fourth Amendment protection applied and the officers must have developed probable cause.  In *Florida v. Jardines*,[17] the Supreme Court held that the use of a drug sniffing canine to search a home and its immediate surroundings—there, a front porch—is a "search" under the Fourth Amendment, and therefore required probable cause to justify such a search.[18]  In contrast, the Court has held that the search of a vehicle during a lawful traffic stop "that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment."[19]  Here, it is undisputed that the dog sniff was confined to the Cadillac in Defendant's driveway; it did not extend to the curtilage or to the outside of the residence.  As such, *Florida v. Jardine* does not apply.

### 4. Cellphone Search

Finally, Defendant challenges the seizure of the two cell phones officers found in the Cadillac and argues that officers lacked probable cause to believe they are evidence of any crime.  The Court disagrees.  Officer Rodgers testified that he believed the multiple cell phones located in the Cadillac were used in furtherance of criminal activity given the amount of methamphetamine in the vehicle and the fact that Defendant possessed firearms.  In his training and experience, he understood that cell phones are often used as a tool of the drug trade.

---

[17] 133 S. Ct. 1409 (2013).

[18] *Id.* at 1420.

[19] *Illinois v. Caballas*, 543 U.S. 405, 409–10 (2005).

The Court finds that the phones were lawfully seized incident to Defendant's arrest.  In the context of a vehicle search, an officer may search a vehicle when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle."[20]  The evidence does not suggest that the officers searched the phones' data at the time of the seizure.  The Government represents in its brief that the cell phones were later searched pursuant to a state search warrant.[21]  For these reasons, the Court finds that seizure of the cell phones at the time of the search did not violate the Fourth Amendment.

## II.   January 29, 2015 Search Warrant

Lawrence Police Detective Mike McAtee testified that he began receiving information in 2011 that Defendant was involved in trading firearms and methamphetamine in Lawrence.  He was contacted in 2013 by Kansas Bureau of Investigation ("KBI") Agent Rantz, who had been investigating Damon Griffin.  Agent Rantz believed that Defendant sold or gave a .45 caliber handgun with a model number "1911" to Griffin.  Officers did not find that handgun when they executed the December 2014 search warrant at Defendant's residence.  Detective McAtee learned from Officer Rodgers' report about the January 21 traffic stop that he recovered a firearm in the Cadillac.  So Detective McAtee prepared a search warrant affidavit for Defendant's known DNA, and for electronically stored data on the cell phones that had been seized on January 21.  The search warrant also sought a known DNA sample for Johnston.  Detective McAtee sought the DNA sample so that he could have the firearm retrieved from the January 21 traffic stop processed for fingerprints and DNA.

The search warrant affidavit did not include the fact that a sample of Defendant's DNA already had been taken during the booking process on January 21 and entered into the CODIS system.  After

---

[20]*Riley*, 134 S. Ct. at 2484.

[21]*See Riley v. California*, 134 S. Ct. 2473, 2485 (2014) (explaining that the search incident to arrest doctrine does not extend to cell phone data; officers must obtain a warrant before searching the data); Gov't Ex. 4.

the judge approved the search warrant, officers conducted a traffic stop of Defendant's vehicle on January 30 for the purpose of taking Defendant to the police station to collect a known DNA sample. After officers stopped Defendant's vehicle on January 30, they asked him to step out of the vehicle and Detective McAtee patted him down.  Defendant offered to remove his coveralls for the patdown search and as the bib to the coveralls fell forward, a ziplock bag fell out that contained a crystal-like substance that Detective McAtee believed was crystal methamphetamine.  A DNA sample was collected and sent to the KBI for comparison to the firearm seized on January 21, and the results were a match.

Defendant moves to suppress **any** fruits of the January 30 stop, arguing that Detective McAtee intentionally or recklessly failed to include the information about the January 21 DNA collection in his search warrant application on January 29.  Although he does not explicitly invoke *Franks v. Delaware*, or request a hearing, he argues that Detective McAtee intentionally or recklessly omitted information in the search warrant affidavit, and that including this information would have negated a probable cause showing to obtain the warrant.  *Franks* held that a search warrant based on an affidavit that includes knowing and intentionally false statements, or statements made with reckless disregard of the truth, may void the warrant.[22]  Upon a showing of falsity by a preponderance of the evidence, the reviewing court is to set aside the false material, and hold a hearing to determine whether the remaining information supports probable cause to believe evidence of a crime would be found at the place to be searched.[23]  The standards under *Franks* also apply to material omissions.[24]

In order to obtain an evidentiary hearing under *Franks*, a defendant's "attack must be more than conclusory and must be supported by more than a desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be

---

[22]*Id.* at 155–56.

[23]*Id.*

[24]*United States v. Knittel*, 462 F. App'x 844, 847 (10th Cir. 2012) (citing *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997)).

accompanied by proof."[25]  Negligent inaccuracies are not sufficient to show falsity as required by *Franks*.[26]

The Court finds no proof that the affidavit intentionally omitted material information. Detective McAtee sought the warrant for purposes of submitting a known DNA sample for comparison by the KBI to the DNA on a particular firearm.  The Government has submitted authority that the KBI laboratory does not permit CODIS samples to be used for such comparisons because they lack the requisite chain of custody to be admissible in court.[27]  Given this policy, the Court cannot find that it was material to the probable cause showing whether Defendant's DNA was previously collected during the booking process for entry into CODIS.  That previous DNA sample was not acceptable for Detective McAtee's comparison to the firearm, which he hoped to compare both to Defendant's and to Johnston's known samples.  He included in affidavit the fact that he knew the KBI required known DNA samples from a suspect and from a person who may have handled or possessed the weapon to be tested.[28]  For these reasons, the Court finds no omission of material information and therefore denies Defendant's motion to suppress the fruits of the traffic stop on January 30 during which officers collected a known DNA sample from Defendant.

### III.   February 20, 2015 Search Warrant and Arrest

#### A.  Factual Background

The arrest warrant for this case was issued on February 18, 2015, and was received by Detective McAtee on February 19.[29]  The case had been filed on February 18, 2015, by sealed Indictment as a Kansas City division case.  The LPD conducted a threat assessment for Defendant's

---

[25]*Franks*, 438 U.S. at 172.

[26]*United States v. Ross*, 920 F.2d 1530, 1534 (10th Cir. 1990).

[27]Gov't Ex. 5 at 5–6.

[28]Gov't Ex. 4 ¶ 6.

[29]Doc. 3.

arrest and determined that a crisis response team was mandatory for executing the arrest because it was considered high risk.  Detective McAtee testified that they wanted to arrest Defendant from his car in the interest of officer safety.  Officers began surveillance at Defendant's residence at about 7:30 a.m. on February 20,  waiting for Defendant to leave so that they could arrest him from his vehicle.  After surveilling the residence for several hours, Defendant had not left, although other individuals came and went.  Finally, at about 1:30 p.m., Defendant and a white male exited the residence and appeared to start working on Defendant's Cadillac.  At that point, the officers decided to arrest Defendant before he or the other individual went back inside the home.  As they approached, Defendant saw them.  They ordered Defendant to the ground, but instead, he bent over and placed his hands on his waist.  The white male moved toward the front door.  While some officers blocked the white male from the residence, Defendant tried to move into the vehicle, at which point an officer pinned him to the front seat.  Detective McAtee took control of Defendant's hand and as he extracted Defendant from the vehicle, noticed a handgun sitting on the driver's seat.

The officers then searched the vehicle and found credit cards and a driver's license attached to a white cell phone and a digital camera.  Officers also seized a utility knife in Defendant's front pant pocket.  In addition, officers recovered a Taurus revolver .357 magnum, 1-2 rounds of ammunition, and a license plate in the trunk of the vehicle.

At approximately 2:30 p.m., Defendant was transported to the LPD Investigation Training Center, but was not immediately interviewed.  In the meantime, Defendant's wife, co-defendant Susan Khampannha gave officers partial consent to search the residence.  Officers secured the residence so that they could apply for a search warrant based on past information learned during the investigation, and based on the firearm they found in the Cadillac that afternoon.

Detective McAtee prepared the search warrant affidavit for Defendant's residence on Ousdahl and it was issued that same day, at 5:30 p.m.  Detective McAtee testified that the warrant was executed minutes after it was signed by the judge; officers completed the search at about 8:00 p.m.  The search warrant contains a probable cause finding that "a crime(s) or criminal use of a weapon has/have been or is being committed" and that certain specified items located at the Ousdahl address may be evidence of a crime: (1) any black plastic box with a handle; (2) any firearm; (3) any ammunitions; and (4) any paperwork identifying gun ownership; such as, but not limited to, receipts and/or bill of sale.

Officers seized the following items from the residence: (1) a small gun safe that contained the Cadillac's vehicle title, showing that Defendant is the current owner and Cody Cavanaugh was the previous owner, and that contained two magazines; (2) three mason jars containing marijuana that were located in the automatic ice dispenser of the freezer; (3) an Altoids box containing methamphetamine and blue pills that appeared to be Viagra without a pharmacy label; (4) a digital scale located in a kitchen drawer, with a small amount of drug residue; (5) a gun safe that was attached to the bottom of a sofa, containing a .45 caliber Glock handgun, keys, and three flash drives.

At 8:18 p.m., after Detective McAtee finished executing the search warrant, he interviewed Defendant with Agent Rantz.  They read him his *Miranda* rights and at 8:21 p.m., Defendant made statements to the officers.  After the interview, Defendant returned to his holding cell and Detective McAtee did not have contact with him again until the morning of Monday, February 23, while he was being transported to the Kansas City, Kansas federal courthouse for his initial appearance.  During this drive, Defendant made voluntary statements to Detective McAtee that were recorded.

The United States Marshals Service ("USMS") has a consistent policy in all three divisions of the District of Kansas that new arrestees must be brought to the courthouse by 2:00 p.m. in order to appear before a magistrate judge.  The purpose of this cutoff time is to allow time for several tasks to

be completed that are prerequisites to a new defendant's appearance before the magistrate judge: processing, such as taking photos, fingerprinting, collecting a DNA sample, and answering booking questions; the pretrial services interview; and sometimes securing an interpreter for the hearing. Although there are occasional exceptions made to this policy, they usually require prior arrangements between arresting officers, the USMS, and the court.  Detective McAtee was aware of the 2:00 p.m. policy.  He did not make prior arrangement with the Marshals to deliver Defendant to the courthouse after the 2:00 p.m. cutoff; he did not know in advance at what time officers would execute the arrest.

### B.  Motion to Suppress Items Seized at Defendant's Residence

Defendant argues that the search of his residence exceeded the scope of the warrant because police seized items other than the four items specified in the warrant: (1) they searched Defendant's vehicle; and (2) they seized electronics, Viagra, and bank cards.  Furthermore, Defendant complains that several of the items seized were not listed on the search warrant receipt.  Defendant contends that police flagrantly disregarded the limitations set by the search warrant by searching both Defendant's house and car, and by seizing items other than those permitted by the warrant.  He contends that all evidence seized under the warrant must be suppressed.  The Government responds that all of the seized items were either within the scope of the warrant, or fall within one of the recognized exceptions to the warrant requirement.  The Government further argues that even if the officers exceeded the scope of the warrant, their conduct would not require suppression.

The Court agrees with the Government that many of the items which Defendant claims exceeded the scope of the warrant were not seized pursuant to the warrant at all.  The items found on Defendant's person and in the Cadillac were seized before the officers even applied for the search warrant.  Therefore, the Court considers whether these items were seized under a recognized exception to the warrant requirement.  Under the automobile exception, the police may "search an automobile

and the containers within it where they have probable cause to believe contraband or evidence is contained."[30]  At the time of Defendant's arrest, he disobeyed orders to get down on the ground and attempted to lunge into a vehicle where a firearm was sitting in plain view of the officers.  The firearm gave the officers probable cause to believe other contraband or evidence of a firearm offense was located in the vehicle.  The license plate was therefore properly seized under the automobile exception to the warrant requirement.

The search-incident-to-arrest exception to the warrant requirement is intended to "ensure officer safety and prevent the concealment or destruction of evidence."[31]  It may "only include 'the arrestee's person and the area within his immediate control . . . mean[ing] the area from within which he might gain possession of a weapon or destructible evidence.'"[32]  Since the Supreme Court decided *Arizona v. Gant*, "the scope of a search [incident to arrest] must be strictly tied to and justified by the circumstances which rendered its initiation permissible."[33]  Thus, "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest."[34]  The Court finds that the officers seized the cell phone, credit cards, driver's license, and digital camera during a lawful search of Defendant's person incident to his arrest.

Defendant challenges seizure of the following items from the residence as outside the scope of the search warrant: digital scales, three flash drives, keys, and the Viagra.  He also challenges seizure of anything that was not a firearm or evidence of firearm ownership, arguing that the omission of

---

[30]*United States v. Burgess*, 576 F.3d 1078, 1087 (10th Cir. 2009) (quoting *California v. Acevedo*, 500 U.S. 565, 580 (1991)) (footnote omitted).

[31]*United States v. Hunnicutt*, 135 F.3d 1345, 1350 (10th Cir. 1998).

[32]*Arizona v. Gant*, 556 U.S. 332, 337 (2009) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)).

[33]*United States v. Edwards*, 632 F.3d 633, 643 (10th Cir. 2001) (quoting *Chimel*, 395 U.S. at 762).

[34]*Gant*, 556 U.S. at 349.

several items on the warrant return shows that police turned a limited search authorized by this warrant into a more general search for evidence of any criminal activity.

The Fourth Amendment requires that search warrants describe with particularity the "place to be searched and the persons or things to be seized."[35]  When officers exceed the scope of a warrant, the general rule is that "only the improperly seized evidence, not all of the evidence, must be suppressed."[36]  However under Tenth Circuit law, "blanket suppression [i]s mandated when a warrant [i]s executed in flagrant disregard for its terms."[37]  This "unusual remedy" has been applied in "rare" cases.[38]  Defendant relies on these rare cases in support of his motion.  In *United States v. Medlin*,[39] the Tenth Circuit ordered blanket suppression where officers seized 667 items of property that were not identified in a warrant that authorized a search for "firearms."[40]  In *United States v. Foster*, officers seized more than sixty items that were not listed on the warrant—"anything of value"—and there was evidence that this was the normal practice of police in that county.[41]  The court found that blanket suppression was warranted because the officers exhibited a flagrant disregard for the terms of the warrant.[42]  "In the vast majority of cases, 'a search is not invalidated merely because some things are seized that are not stated in the warrant.  This is particularly true when the non-specified items are not admitted into evidence against the defendant.'"[43]

---

[35]U.S. Const. amend. IV

[36]*United States v. Le*, 173 F.3d 1258, 1269 (10thCir. 1999) (quoting  *United States v. Hargus*, 128 F.3d 1358, 1363 (10th Cir. 1997)).

[37]*United States v. Foster*, 100 F.3d 846, 851 (10th Cir. 1996).

[38]*Le*, 173 F.3d at 1269.

[39]842 F.2d 1194 (10th Cir. 1988).

[40]*Id.* at 1199.

[41]100 F.3d at 850–51 & nn.5–6.

[42]*Id.*

[43]*Le*, 173 F.3d at 1270 (quoting *Hargus*, 128 F.3d at 1363) (citations omitted).

The Court cannot find that this is one of the rare cases where officers exhibited a flagrant disregard for the terms of the warrant, so even if the seizure of certain items exceeded the scope of the warrant, it would not require blanket suppression.  Most of the items Defendant complains about, as described above, were not seized during execution of the warrant but were seized during earlier searches under recognized exceptions to the warrant requirement.  While it is true that the warrant's return receipt does not specifically list each item seized, it lists most of the items seized, and the Court credits Detective McAtee's testimony that he did not intentionally omit anything from that list.  At most, this omission was negligent.

The Court therefore proceeds to consider whether any of the non-specified items must be suppressed as exceeding the scope of the warrant.  Under the warrant, officers were authorized to seize (1) any black plastic box with a handle; (2) any firearm; (3) any ammunitions; and (4) any paperwork identifying gun ownership; such as, but not limited to, receipts and/or bill of sale.  The Court agrees that the vehicle title and gun safe were within the scope of the warrant.  The paperwork helped officers identify gun ownership.  Officers had previously found firearms in the Cadillac earlier that day and on January 21, but the previous registration for that vehicle showed that Cody Cavanaugh owned the Cadillac.  The registration in the black gun safe proved that Cavanaugh had transferred the title to Defendant's name, tending to show that the guns located in that vehicle belonged to him.  The gun safe was within the scope of the warrant because it was specifically designed to store firearms, which was listed on the warrant.

Other items seized but not listed on the warrant are the digital scale, gun safe, and Viagra pills. The Government contends that these were properly seized under the plain view doctrine.  For the plain view doctrine to apply, (1) "not only must the item be in plain view; its incriminating character must

also be 'immediately apparent'"[44]; and (2) "not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself."[45]

The scale was located in a kitchen drawer, after officers had already recovered suspected marijuana and methamphetamine from the freezer.  Officers believed the scale contained visible drug residue.  And Detective McAtee knew from his training and experience that digital scales are often used by drug distributors to weigh drugs.  Given these circumstances, the Court finds that the incriminating character of the scale was immediately apparent to officers.  The Court also finds that the officers had a lawful right of access to the kitchen drawer because items listed on the warrant, specifically ammunition, could have been found there.  "A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search."[46]

Likewise, the Viagra pills were properly seized under the plain view exception.  The pills were found in an Altoids box along with other illegal drugs.  They were not contained in prescription packaging, nor was there a prescription label for the pills on the packaging.  Given these circumstances, the incriminating nature of the pills was immediately apparent, and the officers had a lawful right of access because ammunition could have been located there.

Finally, the Government concedes that the keys and the flash drives seized from the gun safe under Defendant's couch were outside the scope of the warrant but that it has no intention of using these items at trial.  As such, the motion to suppress as to these two items is moot.

---

[44]*Horton v. California*, 496 U.S. 128, 136 (1990).

[45]*Id.* at 137.

[46]*United States v. Ross*, 456 U.S. 798, 820–21 (1982) (footnote omitted).

### C.  Motion to Suppress Statements

Defendant moves to suppress the statements he made to detectives on the evening of February 20, and on the morning of February 23 while he was transported to the courthouse, because the Government violated the presentment requirements of Fed. R. Crim. P. 5(a), and *McNabb-Mallory*. These rules generally render inadmissible confessions made during periods of detention that violate the prompt presentment requirements set forth in Rule 5(a).  In 1968, Congress passed 18 U.S.C. § 3501, which "modified *McNabb-Mallory* without supplanting it."[47]  Under the rule as modified:

> [A] district court with a suppression claim must find whether the defendant confessed within six hours of arrest (unless a longer delay was "reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate judge]").  If the confession came within that period, it is admissible, subject to the other Rules of Evidence, so long as it was "made voluntarily and . . . the weight to be given [it] is left to the jury."  If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb–Mallory* cases, and if it was, the confession is to be suppressed.[48]

Defendant argues that his statements were made more than six hours after his arrest, and the delay in presentment was unreasonable or unnecessary.  The Court addresses each argument in turn.

There is no dispute that the *McNabb-Mallory* rule applies here because Defendant was arrested on a federal warrant.[49]  It is also undisputed that both of Defendant's statements were made more than six hours after his arrest.  He was arrested at 2:00 p.m., and Mirandized at 8:18 p.m.—just over the six-hour safe harbor period.  His second statement was made three days later en route to the courthouse. The Court therefore proceeds to consider whether the delay was unreasonable or unnecessary under the *McNabb-Mallory* line of cases.

---

[47] *Corley v. United States*, 556 U.S. 303, 322 (2009).

[48] *Id.* (quoting  18 U.S.C. § 3501(c)) (citation omitted).

[49] *See United States v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994).

The Fifth Circuit recently aggregated the many cases considering the types of delays courts find acceptable under *McNabb-Mallory*:

> [B]eyond either unexplained delays or purposeful delays for criminal interrogations, courts have been "careful not to overextend *McNabb–Mallory*'s prophylactic rule in cases where there was a reasonable delay unrelated to any prolonged interrogation of the arrestee."
>
> As a result, the *McNabb–Mallory* doctrine tolerates delays related to legitimate law enforcement procedures, such as the administrative booking of the arrestee; coordinating with multiple law enforcement agencies or with the U.S. attorney's office; or verifying alibis. Delays so that the arrestee can receive medical care and/or sober up have also long been sanctioned.
>
> Delays arising from a shortage of governmental personnel necessary for the initial appearance and transportation thereto (such as attorneys, law enforcement, and translators) also remain acceptable. For the purposes of determining whether there is a shortage of governmental personnel, *McNabb–Mallory* does not require law enforcement officers to drop everything and rush to the magistrate when doing so would imperil public safety. Moreover, under *Mallory–McNabb*, the police are not entirely "forbidden . . . to investigate crime." As such, law enforcement personnel are permitted, within reasonable limits, to investigate whether the crime occurred; search and secure a premises; and secure, confiscate, or destroy contraband before taking an arrestee to a magistrate. And provided that the defendant agrees to cooperate before a period of unnecessary delay, *McNabb–Mallory* permits officers to translate oral confessions into written confessions, and does not require officers to prematurely terminate an interview.
>
> Courts also accept delays when the delays arise out of the unavailability of the magistrate. A magistrate can be considered unavailable due to a host of reasons including: a busy docket; a closed court; or other factors, such as distance and weather, that make transportation impractical, futile, and/or dangerous. The prompt presentment requirement does not require a magistrate to be available twenty-four hours a day, and the government is not required to take the fastest possible route to the courthouse—just a reasonable one.
>
> Finally, in applying *McNabb–Mallory*, a district court should not resort to a "semanticism that obscures the facts" of a case. The overall reasonableness of a delay will vary city-to-city, case-to-case, justification-to-justification.[50]

---

[50] *United States v. Boche-Perez*, 755 F.3d 327, 336–38 (5th Cir. 2014) (quoting *United States v. Garcia–Hernandez*, 569 F.3d 1100, 1106 (9th Cir. 2009); *United States v. Vita*, 294 F.2d 524, 530 (2d Cir.1961); *United States v. Leviton*, 193 F.2d 848, 854 (2d Cir. 1951)) (citations and footnotes omitted).

The Court finds that the delay in presentment in this case was not unreasonable or unnecessary and thus denies Defendant's motion to suppress.  Defendant was arrested on a Friday afternoon at approximately 2:00 p.m.; he was not transported back to the Douglas County jail until about 2:30 p.m., which is approximately a forty-five minute drive from the Kansas City, Kansas courthouse.  The record established that the USMS has a policy of not accepting new arrestees for presentment to a magistrate judge after 2:00 p.m., and the courthouse was not open on Saturday or Sunday.  Defendant was presented to a magistrate judge on Monday morning, the following business day.  Although the USMS makes some exceptions to the 2:00 p.m. rule where previous arrangements are made between law enforcement and the Marshals, the evidence established that no such arrangements were made in this case.  Indeed, Detective McAtee could not have made such arrangements ahead of time because he did not know at what time Defendant would be arrested on February 20.  The Court further finds that the USMS policy is a reasonable one.  Deputy Marshal Craig Beam testified that the policy exists in order to allow adequate time for booking and administrative functions that must be performed before a defendant appears before the magistrate judge, including an interview with a Pretrial Services officer.  In this case, the distance between the jail and the courthouse meant that the officers could not get Defendant to the courthouse before 2:00.  Moreover, the length of delay attributable to the weekend was certainly reasonable, as the courthouse is closed on Saturday and Sunday; a magistrate judge is not required to be available when the courthouse is closed.  The delay was also reasonable because during the six and one-half hour delay on Friday, officers were searching Defendant's residence.

For all of the above-stated reasons, the Court finds that the delay in Defendant's presentment was not unreasonable or unnecessary under *McNabb-Mallory*, so the Court denies Defendant's motion to suppress statements he made during that period of delay.

IV.     **Motion to Dismiss Counts 2 and 3**

Next, Defendant moves to dismiss Counts 2 and 3, which charge violations of 18 U.S.C. § 922(g)(3)—being an unlawful user of a controlled substance in possession of a firearm. Defendant argues that the statute is void for vagueness on its face because it provides no guidance as to the definition of "unlawful user of a controlled substance."  "'When reviewing a statute alleged to be vague, courts must indulge a presumption that it is constitutional, and the statute must be upheld unless the court is satisfied beyond all reasonable doubt that the legislature went beyond the confines of the Constitution.'"[51]  In order to pass constitutional muster, a criminal statute challenged under the vagueness doctrine must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[52]  Importantly, if the vagueness challenge is not raised on First Amendment grounds, it "must be examined in light of the facts of the case at hand.  One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."[53]

Defendant argues that the recent Supreme Court decision of *Johnson v. United States*[54] opens the door to facial vagueness challenges outside of the First Amendment context, even if a statute is not vague in all of its applications.  The Government responds that *Johnson*'s holding was confined to the Armed Career Criminal Act ("ACCA") and does not change prior precedent concerning vagueness challenges to criminal statutes.  The Court agrees with the Government and declines to extend *Johnson* outside the ACCA context.  *Johnson* considered the residual clause in the definition of "violent

---

[51]*United States v. Saffo*, 227 F.3d 1260, 1270 (10th Cir. 2000) (quoting *Brecheisen v. Mondragen*, 833 F.2d 238, 241 (10th Cir. 1987)); *see also United States v. Hunter*, 663 F.3d 1136, 1141–42 (10th Cir. 2011).

[52]*Saffo*, 227 F.3d at 1270 (quoting *United States v. Corrow*, 119 F.3d 796, 803 (10th Cir. 1997)).

[53]*Id.* (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982)); *see also United States v. Welch*, 327 F.3d 1081, 1094 (10th Cir. 2003).

[54] 135 S. Ct. 2551 (2015).

felony,"[55] which had previously required courts to use a "categorical approach" to determine which offenses were captured by the definition.[56]  This approach required courts to look at how the law defined an offense, and not how an individual defendant committed the particular crime at issue.[57] There is no such categorical approach at issue in construing § 922(g).  Nor has the Court located any case law that has extended *Johnson* as urged by Defendant.  Therefore, the Court declines to consider this facial challenge to the statute.

Because Defendant does not raise a First Amendment challenge to the statute, he is left with an as-applied challenge.  The Tenth Circuit has explained that an as-applied challenge to § 922(g)(3) may succeed if the Government fails to introduce sufficient evidence of a temporal nexus between the defendant's drug use and the firearm possession.[58]  But since this challenge is being made pretrial, it is premature and must be denied without prejudice.

## V.      Defendant Khampannha's Motion to Sever

Defendant Susan Khampannha was charged in a single count of the Third Superseding Indictment with maintaining, managing, and controlling a residence for the purpose of storing, using, or distributing methamphetamine and marijuana.  She moves to sever her trial from co-defendant Phommeseng, arguing that Phommeseang made inculpatory statements about Khampannha that present Sixth Amendment confrontation issues under *United States v. Bruton*,[59] and that standing trial

---

[55] 18 U.S.C. § 924(e)(2)(B).

[56] *Johnson*, 135 S. Ct. at 2557 (discussing categorical approach).

[57] *Id.*

[58] *United States v. Edwards*, 540 F.3d 1156, 1162 (10th Cir. 2008); *United States v. Sanders*, 43 F. App'x 249, 256 (10th Cir. 2002); *see also United States v. Bennett*, 329 F.3d 769, 777–78 (10th Cir. 2003) (finding guidelines provision that adopted "unlawful user" phrase from § 922(g)(3) was not unconstitutionally vague as applied to defendant  where government presented evidence of regular and ongoing drug use during the same time period as his unlawful firearm possession).

[59] 391 U.S. 123 (1968).

with Phommeseng would cause her undue prejudice.

Joinder of defendants is appropriate when two or more defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."[60]  This standard is satisfied by showing "a common thread to each of the defendants," which may be "established by common evidence as to various counts."[61]  Here, the defendants are properly joined because the charges against them arise out of the same acts or transactions constituting the offense.  Several charges against Phommeseng arise out of evidence discovered when officers executed the February 20, 2015 search warrant.  Counts 3 and 4 each charge Phommeseng as an unlawful user of controlled substances who possessed a firearm; those firearms were recovered from the residence shared by Phommeseng and Khampannha.  Count V, the single charge against Khampannha, is based on the evidence derived from that search as well—a digital scale in a kitchen drawer, as well as marijuana and methamphetamine in the freezer.

In *Bruton*, the Supreme Court held that the introduction of a co-defendant's out-of-court confession directly implicating the defendant as his accomplice violated the defendant's Sixth Amendment right to cross-examine witnesses.[62]  *Bruton* only applies however if the statement expressly implicates the defendant.[63]  The Court has reviewed the statements Phommeseng made to police officers on February 20 and February 23.  There were no statements made about Khampannha on February 23.[64]  On February 20, Phommeseng made the following statements concerning the charge against Khampannha: (1) when asked if they are both on the lease for the residence, or if it is only in

---

[60]Fed. R. Crim. P. 8(b).

[61]*United States v. Rogers*, 921 F.2d 975, 984 (10th Cir. 1990).

[62]391 U.S. at 124–26, 136–37.

[63]*Richardson v. Marsh*, 481 U.S. 200, 208 (1987).

[64]*See* Gov't Ex. 3.

Khampannha's name, Phommeseng stated that "I 'supposed be on the lease too.";[65] (2) when asked if the drugs belonged to them both, or if they belonged to Khampannha, Phommeseng refused to answer and invoked his right to counsel;[66] and (3) when officers were explaining to Phommeseng what they retrieved from the residence when they executed the search warrant, Phommeseng stated: "ain't nothin' hers.  What y'all charge with, I'll take all of it, whatever it is.  I don't—she don't know none of this shit, don't—she doesn't know nothin'."[67]   None of these statements expressly implicates Khampannha.  In fact, these statements were made in an attempt to exculpate her.  The Court also found no statements in the record by Phommneseng that he used controlled substances inside the residence.  The Court finds no basis for severance under *Bruton*.

The Court may grant severance if a joint trial appears to prejudice a defendant or the Government.[68] Severance should be granted, however, only if there is a serious risk that a joint trial would either compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence.[69] The Supreme Court has stated that such a serious risk

> might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened.[70]

Here, Defendant argues that the evidence introduced at trial against Phommeseng could have a spillover effect that would prejudice her defense.  But the rule in this Circuit is that "a defendant

---

[65] Gov't Ex. 2 at 3:5–8.

[66] *Id.* at 31:18–25.

[67] *Id.* at 34:13–16.

[68] Fed. R. Crim. P. 14(a).

[69] *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

[70] *Id.*

cannot obtain severance simply by showing that the evidence against a co-defendant is more damaging than the evidence against herself."[71]  The Court finds that it is able to minimize any spillover prejudice through jury instructions that will allow the jury to properly give separate consideration to the charges against each defendant.

**IT IS THEREFORE ORDERED** that Defendant Petsamai Phommaseng's Motion to Suppress Evidence Obtained From the Search of his Home (Doc. 37), Motion to Suppress Fruits of First Traffic Stop (Doc. 39), Motion to Suppress Fruits of Second Car Stop (Doc. 41), Motion to Dismiss Counts 2 and 3 (Doc. 43); and Motion to Suppress Statements to Police (Doc. 45) are **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Susan Khampannha's Motion to Sever (Doc. 36) is **DENIED**.

**IT IS SO ORDERED.**

Dated: <u>October 12, 2015</u>

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[71]*United States v. Wardell*, 592 F.3d 1279, 1300 (10th Cir. 2009) (quoting *United States v. Dazey*, 403 F.3d 1147, 1165 (10th Cir. 2005)).